[Civ. No. 14247. Third Dist. Aug. 5, 1974.]

MATTIE E. ROWE, Plaintiff and Appellant, v.
SIGURD HANSEN, as Director, etc., et al., Defendants and Respondents.

COUNSEL

Lawrence L. Curtice and David C. Moon for Plaintiff and Appellant.

Evelle J. Younger, Attorney General, Elizabeth Palmer, Assistant Attorney General, N. Eugene Hill and James D. Claytor, Deputy Attorneys General, for Defendants and Respondents.

OPINION

**PUGLIA, J.**—Mattie E. Rowe, petitioner below (hereinafter petitioner), appeals from a judgment of the superior court denying her petition for writ of mandate to compel the California Unemployment Insurance Appeals Board (board) to set aside its decision denying unemployment compensation benefits and to declare her eligible therefor.

Petitioner was employed from May 26, 1968, to March 8, 1971, by Host International (employer) as a hostess-cashier at employer's restaurant located at San Francisco International Airport. On the latter date

she was discharged. She applied to the respondent, Department of Human Resources Development[1] (department) for unemployment compensation benefits on March 22, 1971. Her application was denied and she appealed the adverse determination to a referee. (Unemp. Ins. Code, § 1328.)[2] After hearing, the referee found that petitioner had not been discharged for misconduct within the meaning of the term used in section 1256 and reversed the determination of the department. The employer appealed from the referee's decision to the board (§§ 1334, 1336). The board reversed the referee, finding that petitioner had been discharged for misconduct and holding her disqualified for benefits. As indicated above, petitioner's application for writ of mandate to the board was denied by the superior court.

The sole issue on this appeal is whether there is substantial evidence in the record of the administrative proceedings to support the trial court's finding that the conduct of petitioner for which she was discharged constituted misconduct within section 1256. We conclude that the evidence in support of the trial court's finding of misconduct is substantial and affirm the judgment accordingly.

On March 8, 1971, petitioner was scheduled to work the 2:30 to 10:30 p.m. shift at the employer's restaurant. Her duties consisted of relieving the cashiers periodically and serving as hostess. Petitioner had a cold and wore a sweater from time to time as conditions at her different duty stations required. Late in the shift, petitioner had the sweater draped around her shoulders, the sleeves hanging loose. Her supervisor, Mrs. Hatt, told her, "Put the sweater on or take it off." Petitioner replied that she was not her (Mrs. Hatt's) child and didn't have to do what she told her. Petitioner started to raise her voice. There were customers seated in the immediate vicinity who could have overheard. To avoid an argument and the resulting unseemly public display, Mrs. Hatt told petitioner to leave, "to go on home." At that point Mrs. Hatt had no intention of discharging petitioner. Petitioner replied that she would not leave. Mrs. Hatt then walked away to her desk, considered the matter two or three minutes and, petitioner not having departed, Mrs. Hatt returned and told petitioner she was terminated.

Employees in the restaurant were not prohibited by the employer from wearing sweaters. However, the rules required that sweaters must be worn

---

[1]Redesignated effective January 1, 1974, as the Department of Employment Development (Unemp. Ins. Code, § 133).

[2]Hereinafter all section references are to the Unemployment Insurance Code unless otherwise indicated.

with the arms in the sleeves, not draped over the shoulder. The rule is designed to prevent loose sleeves from contaminating food or drink. Petitioner had on two previous occasions during this shift been told by Mrs. Hatt to put her arms in the sleeves of her sweater and she had complied. The occasion of her refusal to do so was the third time that day she had been so directed.

In her less than three years on the job, petitioner was warned by employer on numerous occasions for infractions of company rules. This pattern of misconduct emerged early in her employment and recurred with regularity throughout. Among the infractions were: three instances of unauthorized departure from duty before end of shift; four instances of consuming food or beverage on duty; two instances of smoking on duty; smoking in unauthorized areas, e.g., the kitchen; sitting with customers while on duty; engaging in personal conversation with a male friend while on duty; two instances of leaving the cash register unsecured and unattended; taking extended breaks; repeated instances of reading at the hostess stand; being out of uniform; and improperly seating customers in a closed station. All told there were 11 separate instances of misconduct recorded in the employer's log book and numerous other infractions recorded in petitioner's personnel file. Petitioner was admonished about these infractions as they occurred. In addition to verbal warnings, petitioner was, on occasion, given written notice of rule violations. On the second occasion that petitioner was cited for eating on duty she assured the employer it would not happen again. Her assurance notwithstanding, within three months petitioner was warned again for eating on duty and within the year following she had committed yet another such infraction. Much of petitioner's misconduct, including that which was repeated after previous warnings, was viewed by the employer as insubordinate. Petitioner did not deny the infractions but testified she could not recall many of them and that, prior to the terminal infraction, she had never verbally refused an order of her supervisor.

Mrs. Hatt had worked for her employer for five years. She was not petitioner's regular supervisor but had known petitioner since she came to work. The day of the incident and the day preceding were the only occasions Mrs. Hatt had worked a full shift with petitioner. However, for a long period of time the latter part of petitioner's shift had overlapped with the earlier part of Mrs. Hatt's shift. Mrs. Hatt had access to all the documented infractions charged against employees, and in accordance with company policy had kept herself informed of them as they occurred. She was familiar with petitioner's record although she had not recently

reviewed it. Petitioner's next most recent infraction occurred on March 6, two days prior to her discharge. She had been told by Mrs. Suggs, her supervisor, not to seat customers in "D" station. A moment later she seated a group of customers in the "D" station. Mrs. Hatt, in keeping with company policy, had read the summary of this violation in the log book on March 7, the day before petitioner's discharge.

A number of written warnings to petitioner were designated "last warning" or included the further admonition that another infraction would result in termination. Nonetheless the employer's personnel supervisor testified that, "We have been very lenient with Mattie" and that while not compelled to do so the employer had given petitioner a leave of absence and held her job open for seven months while she was ill. The referee discerned in the employer's forbearance an "element of condonation throughout a long period of employment . . . ." Mrs. Hatt testified she fired petitioner for insubordination, that is, "her refusal to do as I asked." Other testimony by the employer made it clear that petitioner was discharged for the incident of March 8 and not for an accumulation of previous misdeeds. Petitioner testified to Mrs. Hatt's rude tone of voice at the time of the ultimate confrontation concerning the sweater and that she "rode my back all day long." In her written application for benefits to the department, dated April 5, 1971, petitioner stated she was discharged for prejudice.

The board adopted the referee's statement of facts, which included a finding that the dismissal of petitioner was "precipitated" by the incident of March 8 and that, in the interim between the confrontation and the dismissal, Mrs. Hatt "had neither time to reflect on [petitioner's] documented record of rule infractions nor to consult with higher management officials in possession of this record." In addition, the board found that Mrs. Hatt had worked for employer for five years; had worked overlapping shifts with petitioner; had access to and was familiar with her record of infractions and warnings; and that petitioner's response to Mrs. Hatt's order regarding the sweater could be heard by customers seated nearby.

The referee concluded that petitioner's reaction to Mrs. Hatt's order was one of pique rather than disrespect, unaccompanied by "a deliberate, wilful intent on [her] part to either disobey . . . or to countermand the order . . . so as to raise the level of conduct to insubordination and 'misconduct.'" The board rejected this determination, concluding that petitioner was discharged for misconduct as the term is used in section 1256. The board characterized petitioner's conduct as a refusal "to comply with the reasonable instructions of her supervisor and [a challenge

to her] authority . . . by her flippant remarks in the presence of customers." In the board's view, the petitioner's record of infractions evinced a resistance to and a flouting of the employer's authority precedent to the discharge which the board opined "was not due solely to the last incident but was a result of the [petitioner's] continuing hostile and inflexible attitude which indicated her disregard of the employer's interests."

In its written decision (Cal. Rules of Court, rule 232(a)) the trial court observed that the decision of the board "may be somewhat broad" but, notwithstanding, petitioner's conduct amounted to insubordination of a degree equivalent to misconduct within section 1256. The trial court based its ruling not "upon this particular transaction alone, but also state[d] that the petitioner's past record was known to the supervisor and would be a factor to justify her action even though at the time of the discharge she may not have relied expressly upon such prior misconduct." The trial court found that the discharge of petitioner was proper on the ground of wilful misconduct, and that the decision of the board was supported by a preponderance of the evidence.

Petitioner urges that this case requires the exercise of a broader scope of review on appeal than is suggested by the substantial evidence test ordinarily applicable to such cases, asserting that there is no substantial conflict in the evidence and therefore it is a question of law whether the conduct for which petitioner was discharged constituted misconduct within section 1256. The functions assigned to the several tribunals typically involved in litigation of this type were succinctly summarized in *General Motors Corp.* v. *Cal. Unemployment Ins. Appeals Bd.* (1967) 253 Cal. App.2d 540, 545 [61 Cal.Rptr. 483]: "We think appellants misinterpret the rule applicable to appellate review of the rulings of the California Unemployment Insurance Appeals Board. As the court pointed out in *Thomas* v. *California Emp. Stabilization Com.*, 39 Cal.2d 501, 504 [247 P.2d 561], the board is a statutory agency without power to make final determinations of fact. Its rulings are subject to limited trial de novo in the superior court. Upon trial de novo the judge must examine the administrative record and exercise his independent judgment as to the value, effect and weight of the evidence. [Citation.] He may draw his own inferences from the evidence in the record, and where the evidence is subject to conflicting inferences, those drawn by the trial court must prevail if supported by substantial evidence. If the trial court's ruling is challenged by appeal, the familar substantial evidence test applies. If substantial evidence supports the trial court's findings of fact, the appellate court may disregard the conflicting evidence, resolve conflicting

inferences in favor of the prevailing party, and affirm the judgment. [Citations.] It is only where the probative facts are not in dispute, and those facts clearly require a conclusion different from that reached by the trial court, that the latter's conclusions may be disregarded. Thus, in *Mark Hopkins, Inc.* v. *California Emp. Com.*, 24 Cal.2d 744, 751 [151 P.2d 229, 154 A.L.R. 1081], the court noted that 'A legal conclusion clearly based on findings of probative facts requiring a different conclusion is invalidated by such probative facts.' [Citation.]"

Here, there is testimonial conflict regarding the decibel level of the exchange between petitioner and Mrs. Hatt, who testified that petitioner's voice was getting loud. Petitioner testified that voices were not raised and there was no argument.[3] There is also conflict between the participants' testimony as to whether petitioner articulated a refusal to comply with Mrs. Hatt's order concerning the sweater. Mrs. Hatt testified that petitioner said "she didn't have to do what I told her . . . ." Petitioner testified that in response to Mrs. Hatt's order she replied: " 'You are speaking to me in a very rude tone of voice. Do you take me to be your little girl or your little fool?' " Petitioner denied that she said she "would put the sweater on or off."

Demonstrably, the evidence is not free from conflict. Nonetheless, the resolution of these conflicts, in favor of or contra to petitioner, does not create a record of probative facts pointing ineluctably to a single conclusion. While the testimonial disparity is not insignificant, the essential facts regarding petitioner's conduct are undisputed. Mrs. Hatt testified that petitioner did not comply with her instructions concerning the sweater. Petitioner neither admitted nor denied failure to comply, testifying only that she "never *said* [to Mrs. Hatt] I would put the sweater on or off." (Italics added.)[4] Similarly, it is uncontradicted that petitioner was ordered to leave—to go home—and that she refused and failed to comply. The evidence of petitioner's prior infractions was not denied.

---

[3] Petitioner's version of the incident appearing in a claims status interview report prepared by the department in connection with her application for benefits recites that Mrs. Hatt "yelled at her." The employer's version in the same report is consistent with Mrs. Hatt's testimony. At the hearing petitioner called a fellow employee to testify that the operation of the restaurant was not disrupted by the incident. This employee also testified that while she did not hear too much of the exchange, there was no heated argument.

[4] After petitioner gave testimony and after Mrs. Hatt had completed her testimony, the referee asked petitioner: "Why did you decide, on the second request made of you by Mrs. Hatt, not to put your arms through the sleeves of the sweater when she asked? [Petitioner]: First of all, the tone of her voice. I didn't say I wouldn't put it on or off."

Petitioner did attempt to mitigate the impact of this evidence, testifying that "a lot of these things I don't even recall. Seem like something was put in the book without even my knowledge about it . . . ." "All these are things that are insignificant to what I was discharged for . . . ."

■ A determination of the true character of petitioner's act, i.e., whether deliberate and wilful or rash and precipitate, requires resort to circumstantial evidence and the inferences reasonably to be drawn therefrom. But the evidence probative upon the issue of intent does not point unerringly in any one direction and is reasonably susceptible of opposing interpretations. Where the evidence is subject to conflicting inferences, it is the function of the trial court to draw its own inferences from the evidence and, if supported by substantial evidence, those inferences are binding upon the reviewing court. (*General Motors Corp.* v. *Cal. Unemployment Ins. Appeals Bd., supra,* 253 Cal.App.2d at p. 545.) Accordingly, the scope of review on this appeal is confined to a determination whether there is substantial evidence to support the trial court's findings. (*Lacy* v. *California Unemployment Ins. Appeals Bd.,* 17 Cal.App.3d 1128, 1134 [95 Cal.Rptr. 566].)

■ We proceed now to a consideration of the applicable law. Insofar as pertinent, section 1256 provides: "An individual is disqualified for unemployment compensation benefits if the director finds . . . that he has been discharged for misconduct connected with his most recent work."

"Misconduct," as used in section 1256, is universally considered to be limited to " '. . . conduct evincing such wilful or wanton disregard of an employer's interests as is found in deliberate violations or disregard of standards of behavior which the employer has the right to expect of his employee . . . . On the other hand, mere inefficiency, unsatisfactory conduct, failure in good performance as the result of inability or incapacity, inadvertencies or ordinary negligence in isolated instances, or good faith errors in judgment or discretion are not to be deemed "misconduct" within the meaning of the statute.' " (*Maywood Glass Co.* v. *Stewart* (1959) 170 Cal.App.2d 719, 724 [339 P.2d 947], quoting from *Boynton Cab Co.* v. *Neubeck,* 237 Wis. 249 [296 N.W. 636]; *Lacy* v. *California Unemployment Ins. Appeals Bd., supra,* 17 Cal.App.3d at p. 1132; *Jacobs* v. *California Unemployment Ins. Appeals Bd.* (1972) 25 Cal.App.3d 1035, 1037 [102 Cal.Rptr. 364]; *Silva* v. *Nelson* (1973) 31 Cal.App.3d 136, 140 [106 Cal.Rptr. 908].)

The legislatively declared public policy of the state, in light of which section 1256 must be interpreted and applied, requires the extension of

unemployment insurance benefits to persons "unemployed through no fault of their own . . . ." (§ 100.)

Accordingly, fault is the basic element to be considered in interpreting and applying the code sections on unemployment compensation. (*Sherman Bertram, Inc.* v. *California Dept. of Employment* (1962) 202 Cal.App.2d 733, 736 [21 Cal.Rptr. 130].) ▇ The test for misconduct is essentially volitional. "The conduct may be harmful to the employer's interests and justify the employee's discharge; nevertheless, it evokes the disqualification for unemployment insurance benefits only if it is wilful, wanton or equally culpable." (*Jacobs* v. *California Unemployment Ins. Appeals Bd., supra,* 25 Cal.App.3d at p. 1037.)

Petitioner, relying on *Silva* v. *Nelson, supra,* 31 Cal.App.3d 136, contends that under any permissible interpretation of the evidence her conduct does not amount to misconduct. In *Silva* the sole issue was whether a single instance of a heated exchange constituted misconduct under the statute. The employee had departed work early without permission. The next day his employer spoke to him about his unauthorized departure, advising that if such conduct were repeated he might as well not return. The employee made a crude remark disparaging the employer and the job. He was immediately discharged, the sole reason therefor being the statement just referred to. The court held (at p. 142) that "the single instance of an offensive remark uttered in the circumstances disclosed in the instant record falls within the category of a mere mistake or error in judgment—a 'minor peccadillo'—and is not misconduct disqualifying [petitioner] from unemployment insurance benefits." *Silva* is not controlling on the facts of this case, however, because there is an essential difference in the nature and quality of the conduct precipitating discharge. In *Silva* the conduct was exclusively verbal. The employee's statement was intemperate and contemptuous but it was not responsive to an order or direction of the employer. There was no act or omission to act evincing a direct challenge to the authority of the employer. At best it signaled a momentary irritability. At worst, it was evocative of a refractory attitude. Even if viewed as a portent of future intractability, it nonetheless amounted to no more than an expression of intent unaccompanied by act or conduct.

▇ In the case at bench petitioner was discharged for "her refusal to do as . . . asked." Petitioner's supervisor directed her to comply with the rules concerning sweaters. She failed to comply. To resolve the impasse without creating a public spectacle, petitioner was ordered to leave, "to go on home." She failed to comply. Only after two omissions to comply

with orders, followed by a few minutes of consideration, did her supervisor form the intent to fire her for "insubordination."

Petitioner does not challenge the reasonableness nor the propriety of the orders and in the circumstances such a challenge would necessarily be unavailing.[5] She was aware of the rule regarding sweaters and had on her supervisor's request twice complied with it the very day of the incident. The order to her to leave was a reasonable solution to a problem created entirely by her own obduracy.

As pointed out above, there is substantial uncontradicted evidence of petitioner's conduct, i.e., her omission to comply with reasonable orders of her employer. We now consider evidence bearing on her intent for it is the intent with which an act is done that invests it with that intangible quality according to which the degree of culpability is gauged.

The referee properly admitted evidence of petitioner's accumulated violations as relevant to her "quality of attitude." Ultimately, he perceived her conduct as the consequence of fatigue and pique and not the manifestation of a deliberate, wilful intent to disobey. Apparently the referee discounted the petitioner's past record on the theory that "the employer's response to the [petitioner's] shortcomings was tantamount to condonation of her misbehaviour [sic] or failure to act in accordance with . . . instructions." Thus viewed, the incident itself, isolated from a considerable mass of circumstantial evidence probative of intent, may reasonably be consigned to a relatively innocuous category. In any event, it is not necessary to assign a value to the referee's interpretation to establish the reasonableness of the opposing interpretation adopted by the board and the trial court.[6] Neither the narrow grounds for petitioner's discharge nor, for that matter, the fact of employer condonation, if it be a fact, preclude consideration of petitioner's past delinquencies on the question of her intent at the time of the terminal incident. As so considered, even where all evidential conflicts are resolved in favor of petitioner, it is reasonable to infer from the facts thereby established that petitioner's conduct was a manifestation of a persistent and enduring intractability that impresses

---

[5]An employee's obligation to comply with her employer's directions is defined in section 2856 of the Labor Code: "An employee shall substantially comply with all the directions of his employer concerning the service on which he is engaged, except where such obedience is impossible or unlawful, or would impose new and unreasonable burdens upon the employee."

[6]We observe that the theory of condonation advanced by the referee would in practice tend to discourage employer toleration of relatively minor delinquencies and would affect adversely the stability of the more marginal employees' job status.

her conduct with the character of insubordination, i.e., a wilful, deliberate violation of reasonable orders of her employer.

Petitioner urges that misconduct within the statute requires wilful, deliberate conduct in disregard of the employer's interests and contends there is no evidence of injury to the employer's interests. The record is devoid of evidence of immediate harm to the employer's economic interests. There was uncontradicted evidence that the incident did not create an obvious disturbance in the restaurant. There was no evidence of a loss of business as a direct result thereof. However, such harm as petitioner contends must be shown cannot reasonably be limited to immediate and direct economic consequences. When the authority of those in whom the employer has confided responsibility for the day-to-day operation of the business is flouted, the interests of the employer suffer.

The trial court's findings of fact are supported by substantial evidence and accordingly the judgment must be and is affirmed.

Richardson, P. J., and Regan, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 30, 1974.